# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| VERNON HERBST, | |
| Plaintiff, | |
| v. | CAUSE NO.: 1:17-CV-18-TLS |
| CSX TRANSPORTATION, INC., | |
| Defendant. | |

## OPINION AND ORDER

This matter is before the Court on Defendant CSX Transportation, Inc.'s Motion for Summary Judgment [ECF No. 26]. The Defendant requests judgment as a matter of law on all the claims that its employee, Plaintiff Vernon Herbst, has asserted against it in this Americans with Disabilities Act (ADA) litigation. In response to the Defendant's Motion, the Plaintiff has decided to no longer pursue claims of "discrimination and retaliation for acts occurring prior to 2014 or [M]arch 1, 2015," as well as "any claims of harassment." (Pl.'s Mem. in Opp'n 2, ECF No. 39). Thus, the Court is left to consider whether the Defendant's actions in connection with the process of returning the Plaintiff to work after he completed an inpatient alcohol dependence treatment program in September 2014 were discriminatory or retaliatory under the ADA.

Furthermore, the Plaintiff filed a Motion to Strike [ECF No. 41] pursuant to Federal Rule of Civil Procedure 56. The Defendant subsequently filed its own Motion to Strike [ECF No. 45] pursuant to Federal Rule of Civil Procedure 12(f).

**FACTUAL BACKGROUND**

CSXT is a railroad transportation company. This case involves the procedures CSXT follows when deciding whether its employees are fit to return to their duties after health-related absences. When an employee is absent from work due to a health condition, its Chief Medical Officer is responsible for assessing whether the employee is safely able to perform his duties before that employee is returned to work. The Chief Medical Officer is considered part of the Occupational Health Department, which includes CSXT's Employee Assistance Program (EAP). The EAP offers counseling, guidance, and referral services to employees who are experiencing issues that impact their well-being, including employees with substance dependency issues who are seeking treatment or other support.

If an employee undergoes inpatient substance abuse treatment, the EAP establishes an aftercare plan following the employee's release from an inpatient treatment center. The Occupational Health Department also assesses the employee's fitness to return to work, and determines whether additional medical documentation, an assessment, or a "return to work" examination is needed to assess an employee's fitness for duty. When an employee is absent for more than seven days, or due to a medical condition that may impact the employee's performance or job safety, the employee must submit an Attending Physician's Return to Work Report from his health care provider.

The Plaintiff has worked for CSXT since 2004, where he started as a conductor. In January 2013, the Plaintiff was promoted to the position of locomotive engineer. During his period of employment with CSXT, the Plaintiff has sought and obtained inpatient treatment four times for alcohol dependence, a condition that he asserts, alone or in combination with his other psychiatric disorders, impaired him in many important areas of life during relapses. The periods

of voluntary inpatient treatment included from July to October 21, 2010; July to August 5, 2011; June 1 to September 24, 2014; and August 17 to October 3, 2016.

For the 2010 alcohol dependency treatment, the Plaintiff contacted the Defendant's EAP. Tom Leathers, an EAP Manager, was assigned to monitor the Plaintiff's situation and to develop a plan for returning to work at the appropriate time. As the EAP Manager, Leathers recommended to the Plaintiff a substance abuse dependency treatment program located in Salem, Virginia. CSXT has an established relationship with the facility. The Plaintiff agreed, and was at the Salem, Virginia, program for three months. Because of CSXT's existing relationship with the Virginia facility, the Plaintiff's treatment providers were communicating with CSXT about the Plaintiff's treatment. When the Plaintiff completed treatment in October, the EAP developed an aftercare plan to assist the Plaintiff in maintaining sobriety. The aftercare plan was based on recommendations from the treatment program that were set forth in a discharge summary and from CSXT's Occupational Health Department. In November 2010, the Plaintiff was medically cleared to return to his conductor position.

Between mid-January 2011 and mid-February 2011, the Plaintiff began missing days of work and failed to meet CSXT's "minimum availability" requirements for being available to work. This pattern continued through the spring and early summer of 2011. In July 2011, the Plaintiff returned to inpatient treatment for alcohol dependency for a one-month period.

The Plaintiff again used a CSXT recommended treatment facility. Leathers had communication with the facility providers and received a discharge summary in August 2011. The Plaintiff agreed to an aftercare plan following his discharge, developed by the EAP based on recommendations from the treatment facility and input from members of the EAP and the Occupational Health Department. In September, the Health Department advised the EAP that the

Plaintiff had to be in recovery and following the 2011aftercare plan for six months before it would consider returning him to service.

The Plaintiff did not agree with the requirement that he demonstrate six months of sobriety before being allowed to return to work. Nor did he believe that such a requirement had been communicated to him when he agreed to the aftercare plan. The Defendant's records, however, show that this was the Occupational Health Department's and the EAP's understanding of what would be required. The EAP case progress notes from December 22, 2011, are a response to the Plaintiff's complaint that he did not know what was going on and that he needed to get back to work to alleviate financial burdens. Leathers left the Plaintiff a message advising him that he had not yet complied with the aftercare plan that he had signed for six months. At the end of January 2012, the Plaintiff complained to Leathers that the Defendant was marking him out sick until March (which would have marked the end of the six-month period for the aftercare plan). In February 2012, the Plaintiff wrote a letter to Leathers expressing his opinion that he should have already been returned to work. According to the Plaintiff, Leathers had not been responsive to his phone calls, and told him only that the Medical Department was denying his return. Eventually, the Plaintiff achieved six months of sobriety and complied with the 2011 aftercare plan, and CSXT returned him to service in April 2012 following a return to work examination.

Several incidents occurred in 2013 and 2014 that suggested to the Defendant that the Plaintiff might be struggling with his mental health or alcohol dependence. At the end of May 2014, the Plaintiff contacted Leathers because he wanted to go back into alcohol dependency treatment and had selected a treatment center. The facility was located in West Palm Beach, Florida. Leathers was not familiar with the program and CSXT did not have an existing

relationship with the treatment center. However, the Plaintiff was free to attend treatment at the facility of his choosing. The Plaintiff, who had to interrupt his telephone call with Leathers, advised Leathers that he would call the EAP back with detailed information about the facility. The Plaintiff, however, did not contact the EAP again before going into treatment, where he would not have any communication with the EAP until several months later. The next notation in the Case Progress Notes is on June 3, 2014, and it states that Leathers attempted to contact the Plaintiff and left him a message. The Plaintiff was marked off sick on June 11.

On June 13, 2014, the Defendant sent the Plaintiff a letter advising that if his ongoing absence since May 31, 2014, was due to his inability to perform his duties for medical reasons, he was required to submit documentation from his heath care provider. The letter warned that if the Defendant did not receive documentation by July 20, 2014, the Defendant would consider the Plaintiff to have voluntarily resigned his employment. A Case Progress Note from July 18 indicates that the Plaintiff remains off sick, has had no contact, his whereabouts are unknown, and he has not submitted any medical documentation to support his absence. On August 15, 2014, the Defendant sent the Plaintiff a letter stating that, by his non-response to its previous letter, he had voluntarily resigned from CSXT effective July 20, 2014.

While he was in treatment in Florida, the Plaintiff had contact with Jamie Modesitt, a union representative. Modesitt relayed information to Leathers near the end of the Plaintiff's inpatient treatment in September 2014. Leathers told Modesitt that the Plaintiff needed to sign a release and have the treatment center contact Leathers. On September 19, 2014, Leathers received a telephone message from the Plaintiff, who indicated that he had about one more week in treatment. He acknowledged that the union told him that the EAP needed to communicate with the treatment center, and he requested that Leathers call him back. Leathers then discovered the

5

August 15, 2014, letter advising the Plaintiff that he was considered to have voluntarily resigned from CSXT effective July 20, 2014. This complicated matters, as the Plaintiff's status as voluntarily resigned had to be changed, and the Plaintiff considered an employee, before the Plaintiff could be deemed medically cleared to return to work.

On November 14, 2014, the voluntary resignation was rescinded. The Plaintiff was also advised by letter on this same date that, to be considered for return to active duty, he had to contact the Treatment Center of Palm Beaches and secure certain documentation related to his treatment, including a discharge summary. The letter also included the numbers where he could fax the information once it was secured.

The Plaintiff completed an authorization for release of information on December 8, 2014, advising the Treatment Center of Palm Beaches to fax the documents to Modesitt, his union representative. Modesitt forwarded the requested documents necessary to develop an aftercare plan to the Health Department on December 12, 2014. The Chief Medical Officer decided that the Plaintiff should be assessed by a therapist to determine his current status with regard to his alcohol dependency prior to returning to work. The Health Department cleared the Plaintiff to return to work on February 18, 2015, after the Plaintiff saw a therapist and agreed to an aftercare plan.

In May 2015, the Chief Medical Officer disqualified the Plaintiff from service because he had not been compliant with his EAP aftercare plan. In June 2015, he was cleared to return to service. The Plaintiff completed another alcohol treatment program with the Palm Beaches facility in late summer 2016. He was medically qualified to return to work following discharge, submission of a discharge summary, and agreement to an aftercare plan and return to work examination.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). "A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence that creates a genuine issue of material fact." *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen–El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

## B. Motions to Strike

Before the Court addresses the Motion for Summary Judgment, it will dispose of the parties' respective motions to strike.

First, the Plaintiff appears to base their Motion to Strike on Federal Rule of Civil Procedure 56(c)(2), which states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies the Plaintiff's Motion to Strike [ECF No. 41]. The Court has noted the Plaintiff's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

Second, the Defendant filed a Motion to Strike [ECF No. 45] certain statements in the Plaintiff's "Genuine Issues of Material Fact and Disputes Facts" and several exhibits that the Plaintiff filed in connection with summary judgment briefing. The Defendant cited Federal Rule of Civil Procedure 12(f) as the basis for their motion. (*Id.*) A Federal Rule of Civil Procedure 12 motion to strike applies to pleadings. Fed. R. Civ. P. 12(f) ("The court may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous material.") (emphasis added). Motions for summary judgment are not pleadings under the Rules. *See* Fed. R. Civ. P. 7(a)(1)–(7) (designating permissible pleadings). As such, proceeding under Rule 12(f) is improper, and the Court will deny the Defendant's Motion. Nevertheless, the Court

has noted the Defendant's arguments and will consider them in its summary judgment analysis to the extent that they are pertinent.

### C. Summary Judgment Motion

The ADA prohibits employers from discriminating against a "qualified individual" on the basis of his disability. 42 U.S.C. § 12112(a). To prove a claim of disability discrimination, the Plaintiff "must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by his disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). The language of the ADA requires proof of "but for" causation. *See A.H. by Holzmueller v. Ill. High Sch. Assoc.*, 881 F.3d 587, 593 (7th Cir. 2018). To defeat summary judgment, the plaintiff must adduce evidence that, when considered as a whole, would permit a reasonable jury to find that CSXT took adverse action against him because of his disability. *See Monroe*, 871 F.3d at 504.

For the sake of efficiency, and because the Court's review of the record reveals triable issues of fact regarding whether the Plaintiff was disabled and was qualified to perform the essential functions of the job with or without reasonable accommodation during portions of the relevant periods, the Court will not include a discussion of the first two elements. The Plaintiff's claim would survive summary judgment if those were the only two elements of his disability discrimination claim. However, the pivotal question in this case is whether the Defendant took adverse employment actions against the Plaintiff on the basis of his disability. *See, e.g.*, *Guzman v. Brown Cty.*, 884 F.3d 633, 641 (7th Cir. 2018) (stating that it was not necessary to decide whether the plaintiff was a qualified individual with a disability because, even if she was,

9

summary judgment was warranted because the evidence did not establish that an adverse employment action occurred as a result of that disability).

For his discrimination claim, the Plaintiff has identified two actions that he believes qualify as adverse, and that were taken against him because of his disability. First, he argues that he suffered an adverse employment action when the Defendant considered him to have voluntarily resigned his employment effective July 20, 2014. This, he submits, was adverse because it impacted the timing of his return to work, as well as the timing of his receipt of benefits.

Assuming, for purposes of the summary judgment discussion, that the designation that he had voluntarily resigned was an adverse employment action, the ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that [the Plaintiff's disability] caused" the designation. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because the Defendant has offered a legitimate, nondiscriminatory reason for concluding that the Plaintiff had voluntarily resigned his employment, the Plaintiff must produce evidence that the Defendant's reasons were pretext for discrimination. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) (citing *McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017)). To show pretext, a plaintiff must establish that the employer did not believe the reasons it gave for the adverse employment action. *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000). Pretext is not shown merely by demonstrating that the employer erred or exercised poor business judgment. *Id.*

The Plaintiff has not established that the Defendant's basis for designating his status as voluntarily resigned was a pretext for disability discrimination. None of the evidence suggests that the Defendant's response to the Plaintiff's ongoing absences and failure to respond to the

Defendant's requests for medical documentation would have been different if he was not disabled and everything else had remained the same. Designating the Plaintiff as having voluntarily resigned was the standard consequence under the Defendant's policies to the Plaintiff's lack of communication in connection with an extended absence. The Plaintiff does not dispute that he failed to respond to the Defendant's letter but, rather, submits that he had a good reason for the failure. The reason, however, does not change the fact that he did not give proper notice to his employer regarding his absences, or change what the Defendant would have genuinely believed. Moreover, even though the Plaintiff complains that the Defendant's letter requesting the documentation was sent to his home address, there is no evidence that the Plaintiff provided an alternative address, or otherwise arranged for the delivery or collection of his mail. Finally, the fact that the Defendant rescinded the voluntary resignation on November 14, 2014—after the Plaintiff communicated that he had not intended to end his employment—is further evidence that the real reason for the employment decision was his failure to respond, not due to an ulterior discriminatory motive.

The second adverse employment action the Plaintiff identifies is the Defendant's delay in returning him to service after his release from the Florida treatment program. Again, because the Defendant has offered a legitimate, nondiscriminatory reasons for delaying his return, he must produce evidence that those reasons were pretext for discrimination.

The Chief Medical Officer considers the locomotive engineer position to be a safety sensitive position based on federal regulations. The Plaintiff has not presented any evidence that this was not an accurate assessment of the position, or that the Chief Medical Officer did not actually believe the position was safety sensitive when he determined whether the Plaintiff was fit to safely perform his duties and return to work. The Defendant was entitled, indeed required,

to take measures to ensure that the Plaintiff would not report to work under the influence of alcohol. *See* 49 C.F.R. § 219.101(a)(1) (stating that "[n]o regulated employee may use or possess alcohol or any controlled substance when the employee is on duty and subject to performing regulated service for a railroad."); 49 C.F.R. § 219.10 (providing that a railroad must exercise due diligence to assure compliance with §§ 219.101 and 219.102 by each regulated employee); *see also Skinner v. Ry. Labor Execs. Assoc.*, 489 U.S. 602 (1989) (holding that random drug testing of railroad workers in safety sensitive positions does not violate the Fourth Amendment despite the lack of a triggering event like an accident or safety rule violation). That the Defendant was not aware of an instance where the Plaintiff had reported to work impaired did not eliminate the concern about preventing such a scenario.

There can be no serious dispute that CSXT had a valid, business interest in ensuring (a) that a locomotive engineer who had two previous alcohol dependency treatments within a relatively short period of time had an aftercare plan in place prior to returning to work and (b) that the aftercare plan be based on information from the employee's inpatient treatment facility. These reasons support the Defendant's request for a discharge summary. It is undisputed that CSXT did not receive a discharge summary for the Plaintiff's June through September 2014 stay at Palm Beaches until December 2014.

Nevertheless, the Plaintiff claims that the Defendant's stated reason for holding him out of service is disingenuous because "nothing prevented the Defendant from obtaining timely copies of the information and records it claims it needed in order to assess [the Plaintiff's] fitness to return to work." (Pl.'s Mem. 15, ECF No. 39.) The Plaintiff believes that Leathers knew he was at Palm Beaches all along, and that Leathers should have requested the appropriate documentation to effectuate his return to work. The Plaintiff claims that he signed a Palm

Beaches authorization/release form that would have given Leathers access to his medical records before his treatment was completed.

To prove discrimination, the Plaintiff must present evidence from which a reasonable jury could find that the reason Leathers did not request a discharge summary directly from the facility immediately upon the Plaintiff's release was so that he could delay the Plaintiff's return to work. According to the Plaintiff, shifting the task of obtaining the discharge summary from Leathers to the Plaintiff is evidence of a conscious delay. He cites the ease with which Leathers obtained the discharge summaries from his previous two treatments. But the Plaintiff fails to acknowledge the difference between the previous facilities where he received treatment and the Florida facility. Specifically, that the Defendant had a relationship with the other facilities that it did not have with the Florida treatment center. It is not genuinely disputed that CSXT's Health Department, including the EAP and Leathers, did not have a relationship with the Florida treatment facility. There is no credible evidence that the Palm Beaches facility contacted Leathers upon the Plaintiff's admission, or otherwise communicated with CSXT. Accordingly, there is nothing in the record upon which a finder of fact could rely to determine that Leathers knew that the Plaintiff had been admitted to a facility, the specific facility where the Plaintiff was receiving treatment, or the details about his treatment, including how long it was expected to last.

Neither did the Plaintiff himself communicate with Leathers or the EAP, either to confirm that he had been accepted to the facility for treatment and admitted, or during the course of his treatment until near its completion. At that time, Leathers advised the Plaintiff that he would need to provide a release. Only one authorization for release of confidential information is designated as evidence in the record before the Court. It is dated December 8, 2014. If the Plaintiff signed one earlier during his treatment, as he alleges he did, there is no evidence that

anyone at CSXT was aware of it. Accordingly, even when Leathers became aware of where the Plaintiff had been for the previous few months, he still did not have reason to believe that he had the ability to obtain documents directly from the treatment provider.

None of the Plaintiff's other designated evidence creates a dispute regarding CSXT's knowledge of the Plaintiff's whereabouts, or its reasons for putting the onus on the Plaintiff to provide the documents that were necessary to return to work once it was discovered he was receiving treatment in Florida. For example, the Plaintiff argues he had several lengthy conference calls with Leathers about the Plaintiff's "plan to re-enter treatment at the Treatment Center of Palm Beaches." (Pl.'s Genuine Issues of Material Fact and Disputed Facts 13 (citing Ex. 6), ECF No. 38-1.) This point has some validity. Exhibit 6, which is an entry in the Case Progress Notes, memorializes that several conversations occurred about the Plaintiff's desire to enter rehabilitation, but not wanting to go to facilities he previously attended. Rather, he reported that he wanted to go to "the treatment center of palm beaches." (ECF No. 38-7.) Leathers advised that it was the Plaintiff's decision where to go, but that to be sure to get concise information from the treatment center. However, the Plaintiff then interrupted the conversation to take another call and stated that he would call the EAP back. The Plaintiff did not call the EAP back. He simply ceased all communication and entered treatment. Considered in its entire context, the evidence would not suggest to a reasonable jury that Leathers was intentionally trying to delay the Plaintiff's return to work by feigning ignorance about his location or his ability to obtain medical records.

The Plaintiff submits that the Defendant received communications from the Plaintiff's treatment providers about his treatment and medical status on August 20, 2014, September 24, 2014, and November 21, 2014, and that at least one of these documents should have been

sufficient to assess the Plaintiff's ability to return to work. None of these communications purport to be a discharge summary from the Palm Beaches facility—the specific treatment provider document that the Defendant maintained was necessary to develop the aftercare plan and to be cleared to return to work. The Defendant's position was consistent with the documentation it had relied upon to develop the aftercare plans and make return to work determinations after both of the Plaintiff's previous inpatient treatments for alcohol dependence. Regarding his 2014 absence, Leathers advised the Plaintiff by letter on November 14, 2014, that, to be considered to return to active duty with CSXT, the Plaintiff would have to contact the Treatment Center of Palm Beaches and secure specific information. Once he secured that information, the Plaintiff would then need to provide it to the Defendant through fax or by sending it to the Health Department. The Plaintiff was also advised that an evaluation might be required to assess his status.

The Court does not agree that the communications from the dates the Plaintiff has identified were a reasonable substitute for the discharge summary—or that the Defendant not considering them a proper substitute is evidence of pretext. There is no record of the Defendant receiving medical documentation on November 21, 2014. The August 20, 2014, progress note states that the Defendant received a doctor's note indicating that the Plaintiff had been under the doctor's care and disabled since June 1, 2014, through approximately September 21, 2014. On September 24, 2014, the Defendant received a return to work report related to the Plaintiff's "alcohol dependence, anxiety, depression and Benzo dependence." (ECF No. 28-6 at 27.) The Defendant does not attempt to compare the contents of those communications to that of a discharge summary or otherwise explain how either of these documents would have been adequate to develop the aftercare plan. The Plaintiff's subjective belief that any of these

15

documents, or others, should have been adequate to develop an aftercare plan or make a determination regarding his fitness to return to his locomotive engineer duties does not undermine the honesty of the Defendant's explanation. *See Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) (noting that pretext is not about whether an employer has been "too hard on its employee") (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

It is undisputed that the Defendant first received the requested discharge summary on December 12, 2014. The Plaintiff suggests that, because he was still off work for another two months, the lack of this treatment provider document was not the real reason for the delay, and that the delay was attributable to conscious acts and omission of the Defendant. However, he makes no attempt to chronicle the events that occurred in that two-month period[1] and, thus, has not marshalled and presented the Court with the evidence on which a reasonable jury could rely to find in his favor. *See Goodman*, 621 F.3d at 654. As the party opposing summary judgment, it was the Plaintiff's responsibility to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir. 2012). "Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are 'obliged in our adversary system to scour the record looking for factual disputes.'" *Greer v. Bd. of Educ. of City of Chi., Ill.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1993)).

The Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment includes a section labeled Cat's Paw Theory of Liability. The Plaintiff argues that the Defendant is liable for discrimination because Leathers, as a discriminatory non-decision maker,

---

[1] The Plaintiff returned a signed copy of the 2015 aftercare plan on February 13, 2015. The Chief Medical Officer qualified him to return to work on February 18, 2015.

infected the Chief Medical Officer's decision-making process. The Plaintiff points to Leathers's involvement in his return to work in 2011 as evidence of Leathers's discriminatory animus. Even taking the inferences most favorable to the Plaintiff, the events of 2011 evidence, at most, a dispute regarding whether the Defendant sufficiently communicated the requirement that the Plaintiff would have to follow the aftercare plan for six months before being permitted to return to work. The 2011 events also show that the Plaintiff did not agree with the requirement and communicated his displeasure to Leathers. The record does not show that Leathers harbored animus against the Plaintiff based on his disability.

The Plaintiff also alleges that Leathers failed to follow normal procedure as the EAP manager when he did not communicate with the Florida provider. But as set forth above, the Plaintiff has not shown that the decision to attend a facility previously unknown to CSXT was not the real reason for the difference. Indeed, when the Plaintiff entered Palm Beaches facility a second time, there were no issues obtaining the documentation required to develop an aftercare plan and return the Plaintiff to work.

The ADA is "devoted to eliminating employment discrimination based on actual or perceived disabilities." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 834 (7th Cir. 2005). Although the Plaintiff assumes nefarious motives in the requirements imposed on him and the time frames for his return to work, and downplays his own role in failing to follow his employer's directives, he has failed to present any evidence showing that the Defendant's proffered explanation was a lie, or that the documentation the Defendant requested would not have otherwise been requested pursuant to the Defendant's normal course of business. His case is, at most, about miscommunication. Accordingly, he has not shown that any of the Defendant's actions were taken against him because of his disability.

For these same reasons, the Plaintiff has not shown that any of the Defendant's actions were in retaliation for requesting time off work to enter a treatment facility, for filing a Charge of Discrimination in December 2014, or for filing an internal ethics complaint against Leathers on January 15, 2015. Surviving summary judgment on a disability-based retaliation claim requires showing (1) statutorily protected activity; (2) adverse employment action; and (3) causal connection between the two. *Guzman*, 884 F.3d at 642. The Plaintiff claims there is suspicious timing between his request for "the reasonable accommodation of time off work to enter into treatment for his disability" and "the decision to terminate him." (Pl.'s Mem. 19.) Putting aside the distinction between a decision to terminate and a decision to conclude that an employee has voluntarily resigned his employment, a plaintiff relying on suspicious timing must ordinarily present other evidence that the employer's explanation for the adverse action was pretext for retaliation. *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864–65 (7th Cir. 2015); *Simpson v. Office of Chief Judge of Cir. Ct. of Will Cty.*, 559 F.3d 706, 713–14 (7th Cir. 2009). For the reasons stated earlier in this Opinion and Order, the Court finds that the Plaintiff has not presented any such evidence as it relates to his voluntary resignation.

The Plaintiff also finds it suspicious that he was advised after filing his Charge of Discrimination on December 12, 2014, that he would have to be assessed by a therapist to determine his fitness to return to work. He maintains that if this requirement were not related to his protected activity, it would have been communicated to him "back in December 2014." (Pl.'s Mem. 20.) The Plaintiff does not identify the date that he was informed of the requirement, and the Court is not required to scour the record looking for it. In any event, according to the Plaintiff, the Defendant obtained his discharge summary and filed a Charge of Discrimination on the same date, so the inference he suggests is created by the timeline is difficult to understand.

Finally, Leathers's November 2014 letter advised that, even after obtaining his discharge summary, an evaluation might be required to assess his status. This was consistent with the Plaintiff's previous aftercare plans. There are simply no facts in the record upon which a jury could rely to find that the Defendant's actions were taken in retaliation for protected activity.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant CSX Transportation, Inc.'s Motion for Summary Judgment [ECF No. 26]. The Court DENIES the Plaintiff's Motion to Strike [ECF No. 41] and DENIES the Defendant's Motion to Strike [ECF No. 45]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

SO ORDERED on February 4, 2019.

s/ Theresa L. Springmann  
CHIEF JUDGE THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT